No. 23-13765

_____

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ALAN CARSON,

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Northern District of Georgia

_____

**BRIEF FOR APPELLANT CARSON**

_____

Amy Levin Weil
THE WEIL FIRM
511 East Paces Ferry Road, NE
Atlanta, Georgia 30305
404-581-0000
Counsel for Appellant Carson

IN THE

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Appellee, | : | |
| | : | |
| v. | : | APPEAL NO. 23-13765 |
| | : | |
| ALAN CARSON, | : | |
| | : | |
| Appellant. | : | |

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to 11th Cir. R. 26.1-1(a)(1), the appellant submits that the following

persons and/or entities are known to have an interest in the outcome of this appeal:

Barbari, Rammy, trial counsel for co-defendant Philip Flores

Barrs, Alicia Marcia, trial counsel for appellant Alan Carson

Benowitz, David, counsel for co-defendant Philip Flores

Bozzo, Peter M., appellate attorney, Department of Justice

Bradford, Michelle, trial counsel for appellant Alan Carson and Envistacom

     LLC

Buchanan, Ryan K., United States Attorney, Northern District of Georgia

Calvert, Victoria M., United States District Judge, Northern District of Georgia

Carson, Alan, appellant

C1-3

Envistacom, LLC, co-defendant

Flores, Philip, co-defendant

Frazee, David A., trial counsel for appellant Alan Carson and Envistacom LLC

Froelich, Jr., Jerome, counsel for co-defendant, Valerie Hayes

Glaze, Jr., Richard Edward, trial counsel for appellant Alan Carson and Envistacom LLC

Hayes, Valerie, co-defendant

Hu, Bingzi, counsel for co-defendant Philip Flores

Huber, Christopher J., Assistant United States Attorney, Northern District of Georgia

Hughes, Alyssa, trial counsel for appellant Alan Carson and Envistacom LLC

Hulsey, Gary Scott, trial counsel for appellant Alan Carson and Envistacom LLC

Lowther, Joshua Sabert, counsel for co-defendants Philip Flores and Valerie Hayes

McClure, Brittany Erin, trial attorney, Department of Justice

Pagan, Paula, trial counsel for co-defendant Philip Flores

Reyes, Faith Kalman, counsel for co-defendant Valerie Hayes

Sinfelt, Meena T., trial counsel for appellant Alan Carson and Envistacom LLC

Sommerfeld, Lawrence R., Assistant United States Attorney, Northern District of Georgia

Spearman, Katryna Lyn, counsel for co-defendant Valerie Hayes

Strand, Stratton C., appellate attorney, Department of Justice

Strongwater, Jay Lester, trial counsel for co-defendant Philip Flores

Sussler, Jonathan, trial attorney, Department of Justice

Verdi, Kerry Brainard, counsel for co-defendant, Valerie Hayes

Vineyard, Russell G., United States Magistrate Judge, Northern District of
Georgia

Walker, II, Murdock, counsel for co-defendant Valerie Hayes

Weil, Amy Levin, appellate counsel for appellant Alan Carson

No publicly traded company or corporation has an interest in the outcome of the
case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Alan Carson submits that oral argument is necessary in this case as it raises significant issues of first impression, including whether the Government's massive mid-trial data dump of discovery is sufficiently prejudicial to warrant a mistrial or, at a minimum, a new trial, and whether the trial judge should have granted a mistrial instead of giving an *Allen* charge after the jury told the judge it was deadlocked and the judge was made aware of the details of the split – including that the recalcitrant jurors were voting to acquit.

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT...............................C1-3

STATEMENT REGARDING ORAL ARGUMENT...................................................i

TABLE OF CONTENTS.................................................................................ii

TABLE OF AUTHORITIES.........................................................................iv

STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES....x

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION......xi

STATEMENT OF THE ISSUES ....................................................................1

STATEMENT OF THE CASE …......................................................................2

    1. Course of Proceedings and Disposition Below…………………...……2

    2. Statement of the Facts……………………………………………………..2

        Overview……………………………………………………………2

        A. Evidence at Trial……………………………………………………3

        B. Mid-trial Discovery Dump……………………………………………9

        C. Jury Deadlock…………………………………………..……13

    3. Standards of Review…………………………………………………..20

SUMMARY OF THE ARGUMENT..................................................... 21

ARGUMENT AND CITATIONS OF AUTHORITY...........................................23

I.    THE GOVERNMENT'S MID-TRIAL "DATA DUMP" OF OVER 100,000 DOCUMENTS PREJUDICED MR. CARSON'S ABILITY TO DEFEND HIMSELF AT TRIAL.............23

    A.    Rule 16 Violation.…………….................................................24

    B.    Dismissal of the Indictment with Prejudice is the Appropriate Remedy..................................................................28

    C.    *Brady/Giglio* Violation.……………….…....................................35

II.    GIVING AN ALLEN CHARGE WAS UNDULY COERCIVE IN THIS CASE; THE TRIAL COURT SHOULD HAVE GRANTED A MISTRIAL AFTER THE FOURTH TIME THE JURY DECLARED ITSELF HUNG AND INFORMED THE COURT OF ITS SPLIT………………….…………………......…...39

III.    EVIDENCE OF MAJOR FRAUD AND CONSPIRACY TO DEFRAUD WAS INSUFFICIENT TO CONVICT……………......…48

IV.    THE GOVERNMENT'S REFUSAL TO DISCLOSE GIGLIO MATERIAL THAT COULD HAVE BEEN USED TO IMPEACH A KEY GOVERNMENT WITNESS PREJUDICED MR. CARSON'S ABILITY TO DEFEND HIMSELF AT TRIAL………...57

.

CONCLUSION ...............................................................................................60

CERTIFICATE OF COMPLIANCE ....................................................................61
.
CERTIFICATE OF SERVICE ............................................................................62

# TABLE OF AUTHORITIES

## CASES

PAGE

*Allen v. United States*,
164 U.S. 492 (1896)…………………...............i, 1, 15, 17, 19-21, 39-43, 45-48

*\*Brady v. Maryland,*
373 U.S. 83 (1963)……………….……….iii, 9, 11-12, 21, 23-24, 29, 31, 35-39

*Brasfield v. United States*,
272 U.S. 448 (1926)……………………….…………………..………..45, 47

*\*Brewster v. Hetzel*,
913 F.3d 1042 (11th Cir. 2019)………………….………….40, 41, 43, 46

*\*Giglio v. United States*,
405 U.S. 150 (1972)……………….…………….….…iii, 1, 20, 22, 35, 36, 57, 59

*Green v. United States*,
309 F.2d 852 (5th Cir. 1962)………..………….…………………………….40-41

*Kyles v. Whitley*,
514 U.S. 419 (1995)……………………………..…………………..……36, 37

*\*Lowenfield v. Phelps*,
484 U.S. 231 (1988)………………………………..…………………40, 45, 47

*Neder v. United States*,
527 U.S. 1 (1999)……………………………..…………………………..50

*Showers v. State*,
407 So.2d 169 (Ala. 1981)……………………………..….…….…………41

*Smith v. United States*,
542 A.2d 823 (D.C. 1988)………………………..…...…………40, 45

*United States v. Anderson*,
416 F. Supp. 2d 110 (D.D.C. 2006)…………………..…………..28

*United States v. Bagley*,
473 U.S. 667 (1985)…………………………………………………………..35

*United States v. Barragan,*
793 F.2d 1255 (11th Cir. 1986)…………………………………………….27

*United States v. Briggs,*
No. 10CR184S, 2011 WL 4017886 (W.D.N.Y. Sept. 8, 2011)…………..…27

*\*United States v. Camargo-Vergara*,
57 F.3d 993 (11th Cir. 1995)…………………………………………27, 30

*United States v. Chafin*,
808 F.3d 1263 (11th Cir. 2015)……………………………….……………20

*\*United States v. Davis*,
779 F.3d 1305 (11th Cir. 2015)……………………………………….40-42

*United States v. de la Cruz-Paulino*,
61 F.3d 986 (1st Cir. 1995)………………………………………………….28

*United States v. Espinosa-Hernandez*,
918 F.2d 911 (11th Cir. 1990)………………………………….………...59

*United States v. Euceda-Hernandez*,
768 F.2d 1307 (11th Cir. 1985)…………………….….………..28-29

*\*United States v. Fernandez,*
780 F.2d 1573 (11th Cir. 1986)………………………………….…………29

*United States v. Gallardo*,
977 F.3d 1126 (11th Cir. 2020)…………………...………….…..…………36

*\*United States v. Govey*,
284 F. Supp. 3d 1054 (C.D. Cal. 2018)……………………..….……31, 32

*United States v. Hernandez*,
554 F. App'x 804 (11th Cir. 2014)………………………………………55

*United States v. Hill*,
313 F. App'x 195 (11th Cir. 2008)……………………………….………32

\*United States v. Hill*,
99 F.4th 1289 (11th Cir. 2024)……………………..………………....39, 41

\*United States v. Johnson*,
139 F.3d 1359 (11th Cir. 1998)……………………….… ………..51

\*.United States v. Jordan*,
316 F.3d 1215 (11th Cir. 2003)……………………… ………57

*United States v. Laines*,
69 F.4th 1221 (11th Cir. 2023)……………………….……...…39

\*United States v. Lyons,*
352 F. Supp. 2d 1231 (M.D. Fla. 2004)…………………………..37

United States v. Maxwell,
579 F.3d 1282 (11th Cir. 2009)………………………… … ……..50

*United States v. Montague*,
No. 14-CR-6136-FPG-JWF, 2016 WL 11621620
(W.D.N.Y. May 17, 2016)……………………………………..……28

*United States v. Noe*,
821 F.2d 604 (11th Cir. 1987)……………………………………27

*United States v. Padrone*,
406 F.2d 560 (2d Cir. 1969)……………………………..…27

\*United States v. Rey*,
811 F.2d 1453 (11th Cir. 1987)…………………………………47, 48

*United States v. Rickets*,
No. 15-153, 2015 WL 9478136 (E.D. La. Dec. 29, 2015)……….………28

*United States v. Rivera,
    944 F.2d 1563 (11th Cir. 1991)……………………….………………27

United States v. Rodriguez,
    799 F.2d 649 (11th Cir. 1986)……………………….……………27

United States v. Samaniego,
    345 F.3d 1280 (11th Cir. 2003)…………………………..………20

United States v. Silien,
    825 F.2d 320 (11th Cir. 1987)…………………………….……..27

United States v. Soto,
    711 F.2d 1558 (11th Cir. 1983)…………………………………..29
.
United States v. Stein,
    846 F.3d 1135 (11th Cir. 2017)………………………….………20

United States v. Thompson,
    25 F.3d 1558 (11th Cir. 1994)………………………….………...54

*United States v. Woodard,
    531 F.3d 1364 (11th Cir. 2008)………………………..………20, 40, 41

*Universal Health Servs., Inc. v. United States,
    579 U.S. 176 (2016)……………………………………………50, 56

## FEDERAL STATUTES

18 U.S.C. § 2………………………………………………………………… 2

18 U.S.C. § 371…………………...................................................... xi, 2, 49, 50

18 U.S.C. § 1031…………………...................................................xi, 2, 49

28 U.S.C. § 1291…………………..................................................... xi

**FEDERAL REGULATIONS**

Federal Acquisition Regulation (FAR), Part 15, 15.201(C)…………………………...54

**FEDERAL RULES**

Fed. R. App. P. 26.1-1(a)(1) ................................................................ C-1

Fed. R. App. P. 32(a)(5) ...................................................................61

Fed. R. App. P. 32(a)(6) ...................................................................61

Fed. R. App. P. 32(a)(7)(B)(i) ...........................................................61

Fed. R App. P. 32(f) .......................................................................61

Fed. R. Crim. P. 12(b)(4)…………………………………………….………28

Fed. R. Crim. P. 12(b)(4)(B)…………………………………………….………28

Fed. R. Crim. P. 16………………………………..……iii, 9, 11, 20, 24, 25, 27, 30, 36

Fed. R. Crim. P. 16(a)(1)(A)…………………………..……………………….………27

Fed. R. Crim. P. 16(a)(1)(E)(i)…………………………………………………25

Fed. R. Crim. P. 16(a)(1)(E)(ii)…………………………………………………25

Fed. R. Crim. P. 16.1…………………………………………………………25

Fed. R. Crim. P. 16.1(a)…………………………………………………………25

Fed. R. Crim. P. 29……………………………………………………………20, 49

**LOCAL RULES**

11th Cir. R. 26.1-1(a)(1) ................................................................C-1

11th Cir. R. 28-1(e) …............................................................................................ix

## OTHER AUTHORITIES

26 R. Lord, Williston on Contracts § 69:12 (4th ed. 2003)…………………..……..…….50

Eleventh Circuit Pattern Jury Instructions (Criminal Cases),
    Trial Instruction T5...........................................................................................19

Small Business Act, Section 8(a), Pub. L. No. 95–507, ch. 1,
    sec. 202(a), 92 Stat.    1757, 1761 (1978)
    (codified at 15 U.S.C. § 637)…..………………………………………………… 4

U.S. Const. amend VI………………………………………………………...…..30, 35

USSG § 3B1.3 …………………………………………………………………….55

*Citations primarily relied upon. 11th Cir. R. 28-1(e)

## STATEMENT REGARDING ADOPTION
## OF BRIEFS OF OTHER PARTIES

Mr. Carson wishes to adopt issues I – V of the brief filed by co-defendant Flores and issues I – V of the brief filed by co-defendant Hayes, as the arguments they make are the same as, intertwined with and/or supportive of the issues raised by Mr. Carson.

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

A.      The United States District Court for the Northern District of Georgia has jurisdiction over this criminal case, in which Alan Carson was charged with offenses against the laws of the United States, including 18 U.S.C. § 371 and 18 U.S.C. § 1031.

B.      This Court has jurisdiction over this direct appeal of Mr. Carson's conviction pursuant to 28 U.S.C. § 1291.

C.      Judgment was entered on the docket on December 1, 2023.

D.      This appeal is from a final judgment that disposes of all parties' claims.

## <u>STATEMENT OF THE ISSUES</u>

I.  WHETHER THE GOVERNMENT'S MID-TRIAL "DATA DUMP" OF OVER 100,000 DOCUMENTS PREJUDICED MR. CARSON'S ABILITY TO DEFEND HIMSELF AT TRIAL.

II.  WHETHER GIVING AN *ALLEN* CHARGE WAS UNDULY COERCIVE IN THIS CASE WHERE THE JURY FOUR TIMES DECLARED IT WAS HUNG AND INFORMED THE COURT OF ITS SPLIT.

III.  WHETHER MR. CARSON'S CONVICTIONS FOR MAJOR FRAUD AND CONSPIRACY WERE SUPPORTED BY THE EVIDENCE.

IV.  WHETHER THE GOVERNMENT'S REFUSAL TO DISCLOSE *GIGLIO* MATERIAL THAT COULD HAVE BEEN USED TO IMPEACH A KEY GOVERNMENT WITNESS PREJUDICED MR. CARSON'S ABILITY TO DEFEND HIMSELF AT TRIAL.

<u>**STATEMENT OF THE CASE**</u>

1.    <u>**Course of Proceedings and Disposition Below**</u>

A federal grand jury sitting in the Northern District of Georgia indicted appellant Alan Carson in a three-count indictment charging him and co-defendants Philip Flores, Valerie Hayes and Envistacom LLC with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 1); and two counts of major fraud against the United States, in violation of 18 U.S.C. § 1031 and 18 U.S.C. § 2 (Counts 2 & 3). (Doc. 1). Mr. Carson pled not guilty. (Doc. 19).

Following a nine-day jury trial, Mr. Carson was found guilty on all three counts. (Doc. 183, 200). He was sentenced to 6 months in prison, (Doc. 269), and was granted an appeal bond, (Doc. 351).

2.    <u>**Statement of the Facts**</u>

**Overview**

In 2015, IntelliPeak entered three Section 8(a) sole-source set-aside contracts with the Government for equipment and services necessary to support the United States's military efforts in Afghanistan. IntelliPeak was the prime contractor on all three contracts, and Envistacom was the subcontractor. Ed Dove, the project manager and contracting officer's representative on the three IntelliPeak contracts, certified to contracting officers responsible for awarding the contracts that he had evaluated the quotes to ensure they were technically acceptable and fiscally reasonable. Ed Dove's

certification was based on independent cost estimates (IGCEs) that he had asked employees of the intended subcontractor on the contracts, Envistacom, to compile. Mr. Carson, vice president of Envistacom and one of several Envistacom employees who assisted Dove in the creation of these IGCEs by obtaining quotes, was prosecuted for his conduct. This appeal follows.

### A.    Evidence at Trial.

On September 22, 2014, the Government awarded a military contract for "Technical and Management Support for Irregular Warfare and Asymmetric Threats" to IntelliPeak Solutions, Inc. ("IntelliPeak"), a Government contractor owned by Philip Flores. (Doc. 328-173-74, Doc. 329-92-93; Ex. D1-172). In February 2015, the Government sought to extend the contract under the same terms it was awarded in 2014, with the objective of adding new materials and services. (Doc. 328-71-72, 173-74, 180; *compare* "Statement of Work" in Ex. D1-1 *with* "Statement of Work" Ex. D1-172). The IntelliPeak contract supported overseas war fighters requiring "boots on the ground" to operate equipment; they must be in a position to be deployed to difficult environments, possibly holding certain classifications and technical skill sets. (Doc. 329-40-41). Any lapse in a contract would create a real issue if people needed to be sent home during active military fighting. (*Id.* at 41). If the contracts had not been awarded by September 2015, which was the end of the fiscal year, there would be no money to fund them, the contracts would end, and the services would cease. (*Id.* at 40).

The plan was to modify the contract which was more efficient than awarding a new contract; the Government was hoping for a quick turnaround and a modification would take approximately four weeks to accomplish. (Doc. 328-178, 180, 187; Ex. D1-43). But a modification couldn't be achieved, so a new contract needed to be awarded. (Doc. 328-180). Micah Kauzlarich, a contracting officer (CO) in the Program Support Center (PSC) of the Department of Health and Human Services (HHS), said that wasn't a problem, that the Government still could direct that the new contract be awarded to IntelliPeak. (*Id.* at 117-18, 138-39, 181). Kauzlarich promised to expedite the process to ensure that the contract was awarded four weeks from the date of receipt of the Military Interdepartmental Purchase Request (MIPR), the funding document that the Department of Defense (DoD) uses to transfer funds from DoD to HHS so HHS can use those funds to award the contract. (Doc. 328-134, 181, 221-22).

Because IntelliPeak was an 8(a)-eligible contractor, the contract was to be a sole-sourced, non-competitively bid contract.[1] (Doc. 327-77, 86). The Small Business

---

[1] The 8(a) Program, from Section 8(a) of the Small Business Act, is intended to assist small businesses that are owned and controlled by socially and economically disadvantaged individuals to help them compete more freely in the American economy. (Doc. 327-67). All 8(a) contracts are sole-sourced, meaning, they are not competitively bid; instead, the contracting officer for a federal agency seeking to enter an 8(a) contract is free to solicit a bid from and negotiate directly with the 8(a) company, determine whether the price is fair and reasonable, and decide whether to award the contract. (Doc. 328-125-28). IntelliPeak was an 8(a)-eligible contractor. (Doc. 330-72).

Administration (SBA) signaled early on that approval of the contract would be given[2], and ultimately the SBA worked with Kauzlarich to achieve a quick turnaround. (Doc. 328-184-86; Ex. D1-43).

Ed Dove was a contracting officer's representative (COR) for the Naval Air Systems Command (NAVIR), an acquisition agency that procures aircraft for the Navy. (Doc. 326-143-45; Doc. 328-66, 226; Ex. D1-30). The COR serves as a go-between between the CO and the Government contractor. (Doc. 326-144, 147). One of Ed Dove's duties as a COR was to provide Independent Government Cost Estimates (IGCEs) when the Government entered a contract to determine what a fair and reasonable price would be for the contract. (Doc. 326-153). On February 23, 2015, Ed Dove sent an email to Micah Kauzlarich advising that he was "looking to increase the ceiling" on IntelliPeak's 8(a) contract and asking what the maximum increase could be. (Doc. 328-133; Ex. D1-15). As Kauzlarich explained to Ed Dove, once they had the MIPR they could issue the solicitation directly to IntelliPeak and award the contract as

---

[2] Every federal agency has a memorandum of understanding with the SBA that details the process to be followed whenever that agency wants to enter a sole-source 8(a) contract. (Doc. 328-127). When a federal agency has identified an 8(a)-eligible company capable of performing a particular contract, the contract is offered to the SBA and the SBA becomes the contractor, and the 8(a) company becomes the subcontractor to the SBA. (*Id.*). Once the SBA accepts that planned procurement, the contracting officer for the federal agency is then free to negotiate directly with that 8(a) company. (*Id.*). The federal agency will then solicit a bid, the agency will then evaluate the bid, the bid will be negotiated, the agency will determine whether the price is fair and reasonable, and then determine whether to award the contract. (*Id.*).

soon as the funds were processed. (Doc. 328-186-87; Ex. D1-43). Kauzlarihk told Dove that the maximum increase was $4 million because it was an 8(a) contract. (*Id*.; Doc. 327-182-83).

Ed Dove sent Kauzlarich a performance work statement (PWS) and an IGCE for the contract. (Doc. 328-135; Ex. D1-204). Kauzlarich in turn replied to Ed Dove that he would need some pricing information to support the reasonableness of the contract price before he could award the contract. (Doc. 328-67-68; Ex. D1-204).

Ed Dove forwarded this email chain to Valerie Hayes, vice-president of Envistacom, using his Government email address (edward.dove@navy.mil). (Doc. 327-75; Doc. 328-68-69; Ex. D1-204). Envistacom was a Government contractor engaged in communications, cyber and intelligence and other exploitation services, and was to be the subcontractor on the IntelliPeak contract. (Doc. 327-74, 77, 84, 86; Doc. 328-195-96). Army Lt. Col. Peter Koch, the Division Deputy and Chief of Operations who provided the funding for the Army contracts, wanted to contract with Envistacom for satellite communications work because of Envistacom's expertise. (Doc. 327-187-88; Doc. 328-16-17, 20-21, 134-36). Valerie Hayes in turn sent Dove's email to Alan Carson who co-founded Envistacom along with his wife and served as vice president of sales and marketing, and to Kathryn Gannon, Envistacom's Program Manager who worked under Valerie Hayes. (Doc. 328-69-70, 77; D1-204).

Per Ed Dove's request, Mr. Carson solicited a quote from Michael Geist, owner of Next Echelon Technologies, a company that consulted with commercial companies that had government contracts with the DoD. (Doc. 326-54-56, 63-64; Ex. D1-30). Geist acknowledged that if Next Echelon had been awarded a contract, he could have partnered with Envistacom to obtain these contract materials for the estimated price he had given Mr. Carson; he had no reason to believe that the costs he had provided were not actual costs on which the materials could have been delivered. (Doc. 326-95-100). Mr. Carson also solicited a quote from Paul Frese, president of Linchpin Solutions, a defense contractor that focused on satellite network for the communications for the DoD. (*Id*. at 108-09, 114-15, 130-31; Exs. D1-18, D1-39). Frese testified the prices were commercially reasonable and if Mr. Carson had asked Frese to procure the items in the contract for the prices in the estimates, he could and would have. (Doc. 326-134-36).

Around this same time, Army Lt. Col. Peter Koch forwarded to Kathryn Gannon an email he and Ed Dove had received from Jamie Monahan of the SATCOM procurement team imploring them to finalize the IntelliPeak contract extension within the next two weeks because the equipment and services were needed in the field to defend the United States during the war in Afghanistan:

> Definitely need to get the extension done" because "this contract
> expires 25 February and all of these guys are in the middle of the

fight in Afghanistan so it's not likely they can stay home for a couple of days."

(Doc. 328-71-73; Ex. D1-181).

The IntelliPeak contract extension ended up being three separate contracts: Micah Kauzlarich was the CO for contract 029A and Don Hadrick, an HHS supervisory contracting officer who provided acquisition services to other federal agencies including DoD and who supervised Micah Kauzlarich, was the CO for contracts 313A and 338A. (Doc. 327-77, 84-86; Doc. 328-222-24; Doc. 329-83, 93; D1-1, D1-3, D1-5). Envistacom provided Ed Dove with the IGCEs for all three contracts per Dove's request. (Doc. 331-95, 99, 106, 115-16, 142, 148, 158-60, 164, 1680,

Once Ed Dove received the IGCE files from Envistacom, he changed the names of the files and "took ownership" of them. (Doc. 327-168, 183). Meaning, when he forwarded the files to Mr. Kauzlarich and Mr. Hadrick, he presented the files, including the IGCEs, as his own. *(Id.)*. As the project manager/COR on these contracts, Ed Dove certified to COs Kauzlarich and Hadrick that he had evaluated each quote to ensure that it was technically acceptable and fiscally reasonable. (Doc. 328-158-60; Doc. 329-21-22; Exs D1-2, D1-4, D1-6). Since the COs who are ultimately responsible for awarding Government contracts are contracting experts, not technical experts, they rely on program managers/CORs to make sure proposed contracts have met the required specifications. (Doc. 329-21-23).

IntelliPeak ended up entering three 8(a) sole-source set-aside contracts with the Government with IntelliPeak as prime contractor and Envistacom as subcontractor: contract ending in "029A" in the amount of $829,618.50 which was for services and supplies including forensic card scanning kits, biometrics force protection kits, small satellite kits, and badging. (Doc. 327-77, 81-83, 86; D1-1); contract ending in "313A" in the amount of $3,515,987.72 which was for services and deliverable findings submissions (Doc. 327-83-84; D1-3); and contract ending in "338A" in the amount of $3,542,270.10 which was for services primarily as well as some material and equipment, specifically a project manager and technical SMEs. (Doc. 327-79, 85-87; Doc. 328-237; D1-5).

### B. Mid-trial Discovery Dump.

On June 27, 2022, the magistrate judge issued an Order directing the Government "[u]pon the defendant's request" to "permit the defendant to inspect and copy discoverable matter, including but not limited to, all Rule 16 materials . . .." (Doc. 29-2). The following month, the defendants sent letters to the Government requesting that all discovery be disclosed to the defense. (Doc. 323-87, 91). On Sunday, March 12, 2023, the evening before trial began, defense counsel sent an email to the prosecution: "Can you please confirm that Rule 16 has been complied with with respect to those investigations and that no *Brady* information is contained in those investigation files?" (*Id*. at 93-94). But it was not until the next evening at 8 pm – the night of the first day

of trial on Monday, March 13, and after the jury had been sworn[3] – that the Government disclosed for the first time that it had failed to produce to the defendants during discovery the .pst files containing emails of Government witnesses consisting of what it first described as 33 emails sent to Ms. Gannon. (Doc. 357-12; Doc. 323-86-87; Doc. 325-9).

The trial reconvened the next day next day, Tuesday March 14, for the selection of additional alternate jurors. (Doc. 323-6). After a lunch break, the Government announced that there was additional discovery beyond the Kathryn Gannon emails that it had not disclosed to the defendants. (*Id.* at 81). This additional discovery was described as consisting of .pst files containing approximately 500 emails to and from the alleged victim in the case, the U.S. Army, which the case agent had culled from a larger cache of 6.5 gigabytes of .pst files. (*Id.* at 121). According to the case agent, this withheld-discovery consisted of approximately 41,944 emails of six military employees. (Doc. 330-86). The curated files included 123 emails of Lt. Col. Peter Koch, the Army initiator of Military Interdepartmental Purchase Requests (MIPRs) (Doc. 323-81, 84-89). The Government first chose to produce paper copies of the PDF versions of these emails. (*Id.* at 81, 129-20). Also available was a "native" electronic version of the 6.5 gigabytes of emails, which the Government eventually agreed to turn over to the defense

---

[3] (Doc. 183).

but was accessible only through the use of the computer program "Relativity." (*Id*. at 122, 126-127).

The prosecutors also candidly admitted that (1) they couldn't guarantee they had disclosed all of the discovery the Government was required to produce under Rule 16, (Doc. 323-83), and (2) they did not know whether these late-produced documents contained *Brady*[4] information because they had not reviewed the materials, (*id*. at 104). Although the defense received a cache of emails during trial, Mr. Carson was never given access to Ms. Gannon's military (.mil) email account. (*Id*. at 121, 124-25).

In response to the data dump, the defendants explained that they did not have the financial resources to continue the trial to review the Government's newest discovery disclosure. (Doc. 323-94-98). Instead, based on the Government's withholding of discovery until trial and the distraction caused by the tardy disclosure; the inability to determine whether the withheld materials contained *Brady* information; and the overall prejudice caused to their ability to mount a defense, the defendants moved to dismiss the indictment, (*id*. at 85-97, 106, 108-14), which the district court denied, (*id*. at 115). The Court found that although the Government had violated its discovery obligations, it did not do so in bad faith. (*Id*. at 119). The court gave the defense the rest of the day to review the 6.5 gigabytes of discovery and report back. (*Id*. at 127-29).

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

The next day, Wednesday, March 15, defense counsel reported back to the court that the defense had reviewed the emails culled out by the case agent, but that those documents were not relevant to the charges in the indictment. (Doc. 325-6). As for the 6.5 gigabytes of .pst files, Mr. Carson's counsel was able to load the files into the Relativity program but was unable to effectively search the files and had been able to review only "some" documents. (*Id*. at 7). Co-counsel had determined that the files for years 2014-15 contained 41,000 documents not including attachments. (*Id*.). Based on the enormity of this mid-trial data dump, as well as the Government's apparent inclusion of Ms. Gannon's military account emails in its most recent disclosure, the defense renewed its motion to dismiss the indictment. (*Id*. at 8-9). By now, the revised estimate of the Government's data dump was that it consisted of somewhere between 41,000–100,000 documents – including a cache of Kathryn Gannon's military emails that previously had been attributed to someone else – and that some defense counsel were still in the process of uploading the documents. (Doc. 325-6-10, 22). After evaluating the magnitude of the Government's discovery breach and the prospect that they would be unable to review the documents during trial or assess their relevancy, defendants asked that the district court reconsider its previous ruling that the Government did not act in bad faith in withholding discovery and dismiss the indictment. (*Id*. at 8-9). As the defense pointed out, because the Government had admitted to disclosing thousands of documents without making a *Brady* assessment of their contents, the burden was

being shifted to the defense to make a mid-trial assessment of whether the newly-disclosed discovery contained exculpatory or impeaching information. (*Id*. at 19-21). Unpersuaded, the motion to dismiss was again denied, and the district court postponed the trial an additional day. (*Id*. at 17, 24-25).

During trial, the case agent testified that she had uploaded the withheld discovery to the Government's cloud-based USAFX for the prosecutors to access, verified that the documents had been uploaded, but had no explanation for why the prosecutors did not then forward the documents to the defendants. (Doc. 330-86-87). The prosecutors never explained why the disclosure was not made before trial. (*Id*. at 138). Defendants renewed their motions to dismiss, (*id*. at 133-34) which the court again denied, (*id*. at 149).

### C.    Jury Deadlock During Deliberations.

The jury began its deliberations on a Friday at 2:09 p.m. (Doc. 331-143). After deliberating 2 hours, 15 minutes, they broke for the weekend at 4:24 p.m. (Doc. 131-145). They resumed deliberations at 9:00 a.m. on Monday, and at 10:20 a.m., after another 1 hour, 20 minutes of deliberations, sent a note with questions about the evidence. (Doc. 201-5; Doc. 199-1). The judge did not answer the questions, and instead reminded the jurors that they should rely on their independent recollection of the evidence and their notes and instructed them to continue deliberating. (Doc. 201-6-7).

At 2:40 p.m., after deliberating another 3 hours, 10 minutes (assuming a one-hour lunch break), the judge received her first indication that the jury was gridlocked. (Doc. 201-7). According to the judge:

> Officer Hutchison alerted me to the fact that the foreperson asked him [to] reach out to me. Apparently, ***four or five of the jurors*** are refusing to even talk. Maybe their minds are made up or something, but they seem to have reached an impasse.

(*Id*. at 7-8) (emphasis added). The foreperson was called into the courtroom, and explained to the judge:

> So when we first started, the first we did, we took a poll where everybody is. In comparison to the latest poll that we took, there wasn't much of a difference except some maybe changed one here, one there, but for the most part it was the same.
>
> What was kind of a glaring thing for me was in our effort to go through specific evidence to prove or, you know, whatever for each count, there were multiple jurors that were not willing to participate. They were just basically closing their minds, did not want to do that, which we explained to them, by referring to your instructions, specifically how we were supposed to weigh every count individually. And even though we did that, they were blind, and they just didn't want to accept it. So even to just take a poll I had to convince them.
>
> They were saying overall I feel like so and so or overall this is what -- no, we need to go over every one. And if we tried to provide the specific detail or exhibits that were presented by the government or otherwise by the defense, they just did not want to go through it. There were specific -- I have to be honest and also say there were others that were raising specific points on both sides and were willing to go through it, but it was difficult to continue.
>
> So at this point we would go through it, but those other jurors will basically have their own conversations. They were not

listening. We tried. Trust me when I say this. But that's where we are. But we do have a poll right now, and none of those counts are unanimous.

(Doc. 201-9). The judge then called the jurors into the courtroom and asked them whether there were some jurors "who are not deliberating with the entire group or maybe not fully participating in the deliberations." (*Id.* at 16). Two jurors responded that they were "all deliberating," and a third juror responded that they "all *deliberated*." (*Id.*) (emphasis added). When the judge specifically asked the third juror whether the jury was still deliberating, he responded, "I believe we feel like we're done, your Honor." (*Id.*). Other jurors "nodded along in agreement with that." (*Id.* at 21; *see also id.* at 22) ("Everybody said, no, we are deliberating, but we are done."). The judge then gave a truncated *Allen*[5] charge:

> I want to remind you all that each of you must decide the case for yourself but only after fully considering the evidence with the other jurors. You must discuss the case with one another and try to reach an agreement. Don't hesitate to re-examine your own opinion and change your mind if you become convinced that you were wrong. But don't give up your honest beliefs just because other things -- others think differently or because you simply want to get the case over with.

(*Id.* at 17). At 3:12 p.m., the jury was sent back to continue deliberating. (*Id.*)

Approximately twenty minutes later, at 3:32 p.m., the judge received a <u>second</u> indication from the jury that they were deadlocked; in a note, the jury advised "We did

---

[5] *Allen v. United States*, 164 U.S. 492 (1896).

deliberate w/ all jurors over and over about the case. We went over all questions they had, all jurors had — We could not agree. (Doc. 201-18; Doc. 199-2). At this point, counsel for Mr. Carson moved for a mistrial. (*Id*. at 18-20). Instead, the judge directed court personnel to instruct the jury to continue deliberating. (*Id*. at 24).

When court reconvened at 4:30 p.m., following about one more hour of deliberations, the judge was advised for the <u>third</u> time that "the foreperson was on his way in to say that they are done, they're not making anymore progress." (Doc. 201-24-25). The jurors again convened in the courtroom, and the following exchange took place between the judge and the foreperson:

> THE COURT: It has been a little bit of time since we were last together. Mr. Fassil, how are you all doing in terms of deliberations, again not telling me any specific decision?

> THE FOREPERSON: Got it. So after we left, we went over some of the same exhibits and facts that we talked about and even found new items that we discussed, but it appears at the end of it all, *it was not enough to sway and change the votes of prospective jurors that already had a vote that was **on the other side of the government***.

> THE COURT: Is there anyone among you who still wants additional time to deliberate?

> THE FOREPERSON: So that's the exact question I asked everybody before we got here. Everybody is pretty much convinced they have heard what they needed to hear, that most of the stuff that we went through did not change their plans -- I mean their votes, and they feel like they're done.

THE COURT: And let me just look around at the jurors. Is there anyone who disagrees even slightly with what Mr. Fassil has just said on behalf of all of you? Is there anyone who wants to continue deliberating?

THE FOREPERSON: I'm the only one I would say.

(*Id.* at 25-26) (emphasis added).  The judge's candid reaction, after hearing from the jury a third time, was that she was no longer sure that the jury should be instructed to continue deliberating: "Well, I'm feeling a little differently about having them come back to deliberate given what we've just heard from [the foreperson]."  (*Id.* at 26).  After the jurors left the courtroom, the judge solicited the opinions of the lawyers, and the defense renewed its motion for mistrial "because it does seem like they have deliberated. And they are not unanimous in their verdict, and they have done their duty."  (*Id.* at 28; *see also id.* at 27) ("[T]he foreperson just said that he found new evidence and was trying to convince his other jurors, and they were not dissuaded. I mean they were not dissuaded from their honestly held beliefs . . ..").  When the Government asked for an *Allen* charge before declaring a mistrial, the defense objected on grounds that giving an *Allen* charge would be "asking somebody or multiple people to move off their honestly held beliefs." (*Id.* at 28-29).  The court called the jurors back into the courtroom, instructed them, "I've heard what you've stated to me, but I would still like you all to continue to deliberate tomorrow," and recessed until the next day at 9:00 a.m.  (*Id.* at 30-31).

When the court reconvened the next morning, Mr. Carson renewed his motion for mistrial, expressing concern over the coercive effect that further instructions would have on members of the jury whom the foreperson described in open court, in front of the other jurors, as being "on the other side of the government":

> We believe that any instructions from the Court will be unduly coercive to the members who are now appearing to be pro defense, that they should reconsider in line with the foreman, and that the Court endorses potentially what the foreman is saying, which is not in line with what the law is.

(Doc. 202-5-6). He also was apprehensive about the "new items" the foreperson mentioned discussing with the "deadlocked jurors." (*Id*. at 6). The defense expressed further concerns about the coercive effect of the judge forcing the jury to continuing deliberating after the judge had been advised that the only juror who wished to continue (the foreperson) was attempting to persuade recalcitrant jurors to convict. (*Id*. at 7-13, 16-17).

The judge declined to declare a mistrial, concluding that the foreperson had said that other jurors were "refusing to deliberate," not that "they were deadlocked," and that even though "it's fair to assume that [the foreperson] is in favor of the government" she did "not know the split." (Doc. 202-17). On the other hand, the judge acknowledged:

> I do recognize what [defense counsel] pointed out, which is that perhaps by me asking them as a group whether they wanted to continue deliberating and the foreperson saying I am the only one could be taken as a sign that I thought they should go with him.

(*Id*. at 18).  The judge repeated the reasonable doubt instruction to the jurors and sent them back to continue deliberating.  (*Id*. at 25).

The jury deliberated that day for another approximately 4 hours (assuming they began deliberating when they reconvened at 9 a.m. and took a one-hour lunch), after which the courtroom security officer advised the judge for a <u>fourth</u> time that the jurors "have not reached a decision" and "nothing is going to change."  (Doc. 202-26).  The prosecutor asked the judge to give the jury an *Allen* charge, but the judge hesitated:

> THE COURT: My concern is that I don't know that the *Allen* charge would accomplish anything given that we're virtually in the same place we were yesterday in terms of the jury indicating that they're not going to be able to reach a decision. They already seem to have it in their heads that today would be the last day. That they said we'll do this until 4:30 makes me concerned that it -- that they already have in their mind that today will be the end of it, and if I give them that instruction at this point, am I sort of pushing them to do something in just a couple of hours when they've been at it longer.

(*Id*. at 26-27).  The defense again renewed its motion for mistrial and objected to the judge giving an *Allen* charge, arguing that under the circumstances, it would be coercive. (*Id*. at 28-29, 30).  The judge then gave this Court's pattern modified *Allen* charge. (*Compare id.* at 33-34 *with* Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Trial Instruction T5).  After deliberating for another two hours, the judge sent the jury home for the day.  (*Id*. at 34).

19

The next day, after deliberating another four hours, 15 minutes (assuming they began deliberating when they reconvened at 9 am and took a one-hour lunch), the jury returned verdicts of guilty against all defendants on all counts. (Doc. 203-5-7).

3. **<u>Standards of Review</u>**

I. This Court reviews a district court's refusal to impose sanctions under Rule 16 for abuse of discretion. *See United States v. Samaniego,* 345 F.3d 1280, 1284 (11th Cir. 2003).

II. This Court reviews a district court's *Allen* charge for abuse of discretion. *See United States v. Woodard,* 531 F.3d 1352, 1364 (11th Cir. 2008).

III. This Court reviews *de novo* a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal. *See United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015).

IV. This Court reviews *de novo* alleged *Giglio* violations. *See United States v. Stein*, 846 F.3d 1135, 1145 (11th Cir. 2017).

<u>**SUMMARY OF THE ARGUMENT**</u>

The trial court should have dismissed the indictment when, after trial had begun and the jury was sworn, the Government dumped 6.5 gigabytes of previously-undisclosed discovery materials on the defense. The Government told the defense that these documents were both relevant and had not been reviewed for *Brady* material, which sent the defense into a panic-stricken frenzy to attempt its own review. The Government's careless discharge of its discovery obligations seriously compromised Mr. Carson's ability to effectively present his defense. Because postponing the trial was not an available option, the court should have granted the defense's motion to dismiss.

Under the circumstances of this case — where the jury informed the court four times during its deliberations that it was deadlocked and unable to reach a verdict, and where the foreperson advised the judge in front of the jury that he and other jurors were unable to "change the votes" of other jurors who "were on the other side of the government — the court should have declared a mistrial. Instead, it gave a modified *Allen* charge. The coercive impact of the trial court's charge posed an impermissible risk that the holdout jurors surrendered their firmly-held belief in Mr. Carson's innocence, and capitulated when they voted to convict.

The evidence does not support Mr. Carson's conviction for defrauding the Government or conspiring to do so. Mr. Carson's involvement in the submission of IGCEs to the Government was not part of a scheme to defraud the Government; instead,

the Government through its agent, Ed Dove, solicited him to provide the quotes. Inexplicably, Ed Dove, the supposed mastermind behind this alleged crime, was not charged; instead, he got off scot-free and was allowed to retire with full benefits. Additionally, any alleged fraud would not have been material because the Government received exactly what it contracted for and incurred no loss.

The trial court should have excluded the testimony of a key Government witness, Donald Hadrick, when the prosecution refused to disclose *Giglio* material that Mr. Carson could have used to impeach Hadrick's testimony. Hadrick was a supervisor for the PSC, a division of HHS that awards Section 8(a) contracts. The Government refused to release its file on an investigation which uncovered that in about 75 percent of the DoD/SBA Section 8(a) sole-source contracts, the PSC was not enforcing limitations on subcontracting. Mr. Carson sought to use the investigative file in cross-examining Hadrick on his claim that he was duped and never would have awarded the subject contracts had he known of Envistacom's involvement in the creation of the IGCEs. The court should have granted Mr. Carson's motion to exclude or, at a minimum, ordered the prosecution to produce the investigative file.

## ARGUMENT AND CITATIONS OF AUTHORITY

I.      **THE GOVERNMENT'S MID-TRIAL "DATA DUMP" OF OVER 100,000 DOCUMENTS PREJUDICED MR. CARSON'S ABILITY TO DEFEND HIMSELF AT TRIAL.**

Mr. Carson was indicted in May 2022 for his involvement in obtaining cost estimates for a government contract being awarded to his company as a subcontractor. Defense counsel sent the prosecution a letter in July 2022 asking for assurances that all the Government's discovery and *Brady* obligations had been met. (Doc. 323-87, 91). But it was not until six months later, after Mr. Carson's March 2023 trial had begun and the jury had been sworn – and jeopardy had attached – that the Government disclosed over 100,000 documents relevant to Mr. Carson's case, including emails from at least six potential Government witnesses. (Doc. 323-81, 85-87; Doc. 325-22). Although the Government had previously made disclosures of approximately 2.5–3 million documents (over a terabyte [1,000+ gigabytes] of data), it had failed to disclose until trial anything related to the Army, the actual customer – and alleged victim – of the contract. (Doc. 85-3; Doc. 323-96).

As the Government was well-aware — whether intentional or not — this mega-data dump was made too late in the game for the defense to be able to carefully review the documents or make effective use of their contents. Although the prosecutors initially blamed the non-production on their case agent and issues relating to uploading the material, (Doc. 323-80), the agent testifying under oath disputed the prosecutors' version

of events; she denied any problem with the upload and placed the blame squarely on the prosecution team. (Doc. 330-86-87, 133-29). In other words, there was a lot of finger-pointing, but no clear explanation as to why the Government failed timely to produce the mountain of Rule 16 discovery pretrial. Worse, the Government admitted that it was unsure whether all of the discovery *ever* was produced, (Doc. 323-83), and that it never reviewed the documents in its possession to determine whether they contained *Brady* material, (*id*. at 104). Given the obvious impairment to Mr. Carson's ability to defend himself at trial, as well as the Government's laissez-faire attitude toward compliance with its discovery obligations, he moved for dismissal of the charges with prejudice. (Doc. 325-6-9; Doc. 330-133-39), which the court refused to do, (Doc. 330-149-50). The district court should have granted the motion.

### A. Rule 16 Violation.

Rule 16 of the Federal Rules of Criminal Procedure provides in relevant part:

> **(E) Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> **(i)** the item is material to preparing the defense;
> **(ii)** the government intends to use the item in its case-in-chief at trial . . ..

Fed. R. Crim. P. 16(a)(1)(E)(i) & (ii).  On June 27, 2022, the district court issued an order in this case that directed the Government and the defense to "confer regarding . . . "resolution of issues related to discovery production and the mechanics thereof, including the timing and procedures for pretrial disclosures, *see* FED. R. CRIM. P. 16.1[6] . . .." (Doc. 20-2).  In compliance with this order, Mr. Carson sent the Government a formal discovery letter on June 30, 2022, requesting all discovery.  (Doc. 48-1).

In a July 8, 2022, motion Mr. Carson filed to extend his time to file pretrial motions, he explained to the district court that "the Government indicated that it still has two categories of information to produce which are not ready," one of which consisted of scanned versions of hard copy documents which were seized from Envistacom, LLC in 2019 that are still being reviewed by the Government's filter team." (Doc. 48-1).  At that time, the Government represented to Mr. Carson that "it is unknown when all documents will be produced to Defendants." (*Id*.).  During a September 2022 pretrial conference, the Government represented to the court that the "vast majority" of

---

[6] Rule 16 .1 of the Federal Rules of Criminal Procedure provides in relevant part:

> **(a)  Discovery Conference.** No later than 14 days after the arraignment, the attorney for the government and the defendant's attorney must confer and try to agree on a timetable and procedures for pretrial disclosure under Rule 16.

Fed. R. Crim. P. 16.1(a).

discovery had been produced, and that only "small productions of materials" gathered during the execution of a search warrant on Envistacom and "some iTunes backups from three of Mr. Carson's devices" remained outstanding. (Doc. 324-6-7). The Government was wrong. The evening of the first day of trial, after the jury had been sworn, it unleashed a torrent of discovery on the defense.

The Government candidly admitted that it could not explain how or why the Government failed to produce this discovery pretrial. (Doc. 330-139: "THE COURT: At this point, Mr. [Prosecutor], do you know what happened? MR. [PROSECUTOR]: We don't."). Nor was the Government even certain that all of the documents that it was required to produce during discovery *ever* were produced:

> THE COURT: Do you have concerns about any other documents that may have not been produced? Anything else that kind of falls in this category?
>
> MR. HUBER: So we have -- all of the documents we've identified were, as I understand it, uploaded the same day -- uploaded at the same time, and the reason they were not produced was for all the same reason is my understanding.
>
> We have not identified any other similar issues. I think in some of the motions, the defendants have referenced the voluminous nature of the discovery, and so ***can I stand here today and say every single piece of paper is produced? I'm not going to do that.***

(Doc. 323-83).

This Court does not countenance the prosecution's mishandling of its discovery obligations in a criminal case.  As the Court explained in *United States v. Camargo-Vergara*, 57 F.3d 993 (11th Cir. 1995):

> A discovery violation under rule 16(a)(1)(A) or a standing discovery order is reversible error only when it violates a defendant's substantial rights. *See United States v. Rivera,* 944 F.2d 1563, 1566 (11th Cir. 1991); *United States v. Silien,* 825 F.2d 320, 323 (11th Cir. 1987); *United States v. Barragan,* 793 F.2d 1255, 1259 (11th Cir. 1986). ***Substantial prejudice exists when a defendant is unduly surprised and lacks an adequate opportunity to prepare a defense***, or if the mistake substantially influences the jury. *United States v. Rivera,* 944 F.2d at 1566; *United States v. Barragan,* 793 F.2d at 1259. Inadvertence does not render a discovery violation harmless; rather, the purpose of rule 16 is to protect a defendant's right to a fair trial rather than to punish the government's non-compliance. *United States v. Noe,* 821 F.2d 604, 607 (11th Cir. 1987); *United States v. Rodriguez,* 799 F.2d 649, 654 (11th Cir. 1986); *United States v. Padrone,* 406 F.2d 560, 560–61 (2d Cir. 1969).

57 F.3d at 998–99 (emphasis added).  Indeed, prosecutors have a heightened responsibility to timely disclose Rule 16 discovery in an organized and readily accessible fashion when the discovery consists of voluminous amounts of electronically stored information (ESI):

> Particularly in multiple defendant cases such as this, where the discovery is complex and voluminous, courts have imposed on the government the obligation to organize and disclose discovery materials in a process and format that permits defense counsel to effectively review ESI material and prepare for trial in an efficient and productive manner. *See, e.g., United States v. Briggs*, No. 10CR184S, 2011 WL 4017886, at *8 (W.D.N.Y. Sept. 8, 2011) ("[T]he <u>Government</u> is the party better able to bear the burden of

organizing these records for over twenty defendants in a manner useful to all.")(emphasis in original). So called "data dumps" (even if denominated as "open file discovery") do not comply with Rule 16. In meeting its disclosure obligations, the government "may not simply identify a large number of documents that it may or may not seek to introduce at trial." *United States v. Rickets*, No. 15-153, 2015 WL 9478136, at *3 (E.D. La. Dec. 29, 2015). *See also United States v. Anderson*, 416 F. Supp. 2d 110, 112 n.1 (D.D.C. 2006) (rejecting government's argument that it satisfied Rule 12(b)(4)(B) by providing open-file discovery and giving notice that it intended to use all of materials provided to defendant pursuant to that policy); *United States v. de la Cruz-Paulino*, 61 F.3d 986, 993 (1st Cir. 1995)("[O]pen file policy does not, in and of itself, satisfy this notice requirement [of Rule 12(b)(4)] because it does not specify which evidence the government intends to use at trial.")

*United States v. Montague*, No. 14-CR-6136-FPG-JWF, 2016 WL 11621620, at *1 (W.D.N.Y. May 17, 2016). In Mr. Carson's case, 6.5 gigabytes of 50,000 – 100,000 unsearchable emails were disclosed mid-trial in a manner that was virtually impossible to review. (Doc. 325-5-7). The Government's irresponsible handling of its discovery obligations prejudiced Mr. Carson's ability to defend himself at trial.

### B. Dismissal of the Indictment with Prejudice is the Appropriate Remedy.

This Court has announced a multi-factor test for determining the sanctions that a district court should impose when the Government has violated a discovery order:

Among the factors the court must consider 'are the reasons for the Government's delay in affording the required discovery, the extent of prejudice, if any, the defendant has suffered because of the delay, and the feasibility of curing such prejudice by granting a continuance or, if the jury has been sworn and the trial has begun, a recess.' *United States v. Euceda-Hernandez,* 768 F.2d 1307, 1312

28

> (11th Cir. 1985) (citations omitted). Finally, the district court should determine and consider whether the prosecutor acted in bad faith in violating the magistrate's discovery order. *See United States v. Soto,* 711 F.2d 1558, 1563 n. 10 (11th Cir. 1983).

*United States v. Fernandez*, 780 F.2d 1573, 1576 (11th Cir. 1986). Here, all factors weighed in favor of dismissing Mr. Carson's indictment.

First, the Government has never explained the reason it did not disclose the withheld discovery well in advance of trial, allowing Mr. Carson time to review it. Indeed, there has been much finger-pointing between the case agent and the prosecutors. So the reason for the delay is a factor that weighs against the Government. Second, the defense was inherently and devastatingly prejudiced by the mid-trial distraction of an enormous dump of electronic data, characterized by the prosecution as containing information "relevant" to the trial yet never examined by the Government for *Brady* material. (Doc. 323-103, 106). Indeed, the vast majority of the emails involved the Army, the main customer that funded all three contracts. The defense never recovered from the distraction caused by being forced to divert its attention away from managing the trial to reviewing these emails. This factor, too, weighs against the Government. Third, there was no alternative the district court could have taken that could have cured the prejudice to Mr. Carson's defense. The Government's wanton mishandling of its discovery obligations placed Mr. Carson — and the district court — in an untenable position, with no good option to protect his rights to prepare and present a defense at

trial. Asking for a recess sufficient to allow him time to review and digest the reams of new discovery dumped on him mid-trial by the Government was not an option for Mr. Carson: as defense counsel explained to the district court, Mr. Carson could not afford to continue to pay his trial team to disengage from trial, spend the weeks or months necessary to review gigabytes of new discovery[7], and then regroup for a later trial down the road.[8] (Doc. 323-93-94). A lengthy recess also was not an option for the court; because a jury already had been sworn, reconvening that jury with the same jurors and alternates after a protracted adjournment would have been impractical if not impossible. The district court's only real option was either to dismiss the indictment or declare a mistrial, neither of which it did. Instead, the court granted the defense a two-day continuance, (Doc. 325-24), which the defense made clear was insufficient to protect Mr. Carson's Sixth Amendment right to a fair trial, (Doc. 323-85-97, 106, 108-14; Doc. 325-6-9, 19-21). Finally, the Government's obvious disregard of Mr. Carson's rights under Rule 16 — intended to protect his right to a fair trial[9] — suggests bad faith on the part of the prosecution. This factor, too, weighs heavily against the Government.

---

[7] Defense counsel never completed its review of the discovery dump.

[8] As of sentencing, Mr. Carson owed over $1 million to his trial lawyers. (Doc. 284-53).

[9] *See Camargo-Vergara*, *supra*, 57 F.3d at 999 ("[T]he purpose of rule 16 is to protect a defendant's right to a fair trial . . ..").

By refusing to dismiss or grant a mistrial, the district court allowed a criminal trial to proceed under circumstances where the defense was deprived of the opportunity to fully review discovery to which it was entitled, and to proceed with the assurance that materials held by the prosecution did not contain *Brady* material. The defense was hamstrung the entire pretrial period by the prosecution's egregious failure to produce these materials, all while the Government was using this information in building its case against Mr. Carson. Compounding the catastrophe, defense counsel was forced to divert its focus and attention during trial from preparing witness cross-examination and discussing trial strategy to frantically reviewing emails.

There appear to be scant, if any, reported cases in which the Government engaged in a near-trial or mid-trial data dump, and none involving the magnitude of the dump in this case. That is likely because when — or if — similar circumstances have arisen, either the court has dismissed the indictment or declared a mistrial, or the Government has dismissed its case. One near-trial case is *United States v. Govey*, 284 F. Supp. 3d 1054 (C.D. Cal. 2018), where the defendant moved to dismiss a drug and counterfeiting indictment based on the Government's untimely disclosure of almost 100,000 material documents within a week of trial. As the district court observed:

> the Government produced the evidence to Defendant in a manner that demonstrated blatant indifference and reckless disregard for Defendant's ability to use the materials at trial. The Government did not produce a single piece of the material evidence until February 15, 2018, approximately a week before the trial was scheduled to

31

begin. The Government then dumped 75,000 material documents on Defense counsel within the span of a week. In addition, on the eve of trial, the Government dumped over 20,000 material documents and an hour and a half of video footage on the Court, requesting significant privilege determinations. It was downright disingenuous for the Government to expect the Court to review such a magnitude of material documents in such short order and then turn those documents over to the defense so Defendant could make use of the documents. Neither the Court nor Defendant possesses superpowers.

284 F. Supp. 3d at 1062. In dismissing the indictment, the court concluded that "[t]he Government's untimely disclosure occurred way too late for Defendant to review such an enormous amount of material documents and use them at trial," and thus the trial court "now has no choice but to dismiss the charges against Defendant with prejudice." *Id*. at 1056.

There are a few cases in which a conviction was upheld following a mid-trial disclosure by the Government, but none come close to the facts of this case. For example, in *United States v. Hill*, 313 F. App'x 195, 196–97 (11th Cir. 2008) (unpublished), the Eleventh Circuit upheld a conviction where the Government made a mid-trial disclosure of **one document** — a videotape of the defendant's statement to police. The Court in *Hill* held that the discovery violation was harmless because (1) it did not affect Hill's ability to present a defense, (2) the video's influence on the jury was invited, and (3) and no reasonable probability exists that the late disclosure affected the outcome of the trial. The same cannot be said for Mr. Carson's case.

First, the mid-trial disclosure by the Government of over 100,000 documents affected Mr. Carson's ability to present a defense because he was unable to complete his review these documents during the two-day mid-trial continuance or during trial breaks. (Doc. 330-134). In fact, Mr. Carson *still* hasn't been able to complete his review of these late-disclosed materials. Instead, defense counsel's attention was diverted from managing trial strategy and preparing for witness cross-examinations to speed-reading emails. Second, Mr. Carson did not invite the late disclosure's influence on the jury. And third, the Government is unable to carry its burden to establish that no reasonable probability exists that the late disclosure affected the outcome of the trial. Indeed, it is impossible to conceive of a scenario in which the mid-trial disruption caused by a massive withholding by the Government of relevant discovery materials of which the defense is physically incapable of conducting a complete review would *not* affect the outcome of a trial or prejudice a defendant's right to present a defense.

In determining whether the Government acted in bad faith in making this late disclosure — which is not a requirement for relief, but instead a factor which supports a finding that the Government's conduct prejudiced Mr. Carson — this Court should put this incident in the context of the Government's other careless behavior in this case. At the same time the Government was beginning its mid-trial date dump, it also chose to disclose for the first time that Army Lt. Col. Peter Koch, the end user of the government contract and the alleged victim in this case, had been having an affair with arguably the

33

Government's star witness, Kathryn Gannon.   (Doc. 187-1, 323-83-84, 86-88).

Apparently, this tardy disclosure was prompted by an email sent by co-defense counsel

to the Government the evening before jury selection, imploring:

> We have seen investigations into Vano, LTC Koch, and Kathryn
> Gannon referenced throughout the discovery. Can you please
> confirm that Rule 16 has been complied with with respect to those
> investigations and that no Brady information is contained in those
> investigation files?

(Doc. 187-2).  It was not until the following evening, after a jury was sworn, that the

Government disclosed the affair between Ms. Gannon and Lt. Col. Koch, but refused to

disclose any details of it.  (*Id*.).  The mere fact of the relationship certainly raised the

prospect that Lt. Col. Koch directed the subject government contract to go to the

company where his girlfriend worked for reasons wholly unrelated to Mr. Carson, who

was unaware of the affair.  (*Id*. at 89).  This would have provided a motive for Ms.

Gannon to implicate the defendants, to take the focus off of her and the improper affair

she was having with a married superior in the Army.  (*Id*. at 87-90; Doc. 187-1).  When

the Government refused to disclose the contents of its investigative file, the defense

jointly moved to dismiss the indictment or, in the alternative, prohibit the Government

from calling Kathryn Gannon as a witness at trial, (Doc. 187), which the district court

denied, (Doc. 323-118-19).

There also was the matter of the Government's refusal to disclose HHS's

investigation into Don Hadrick, the HHS Program Support Center's (PSC's) contracting

officer for two of the three contracts in question who testified for the Government at trial. (Doc. 328-221-22, 225-26). This investigation involved the entire contracting shop (the Program Support Center or "PSC") which Hadrick managed as a supervisory contracting officer and resulted in Hadrick being put on administrative leave. (Doc. 323-89-90, 98, 100-101; Doc. 328-226-29). The Government refused to disclose its investigative/personnel file of Mr. Hadrick, which might have exposed his involvement in the charged offense or other impeaching information, and the district court refused to either compel the disclosure or exclude his testimony at trial. (Doc. 175; Doc. 323-118-19; Doc. 331-14).

Placed in context, the Government's pattern of disregard of its discovery and disclosure obligations impaired Mr. Carson's ability to defend himself in a manner contemplated by the Sixth Amendment's guarantee of the right to a fair trial. Because the Government's conduct slanted the playing field in a way that could not be leveled, the district court should have dismissed the indictment.

### C. *Brady/Giglio* Violation.

The Government has a constitutional duty to disclose information that could be used to impeach a key government witness and which if suppressed would deprive the defendant of a fair trial. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Bagley*, 473 U.S. 667, 675 (1985). To establish a *Brady* violation, a defendant must show (1) that the prosecution possessed

evidence "favorable" to him, which can include evidence with impeachment value; (2) that he didn't possess the evidence and couldn't have obtained it with due diligence; (3) that the prosecution suppressed the evidence; and (4) that, if the evidence had been disclosed to the defendant, it is reasonably probable that the outcome of his proceeding would have been different. *See United States v. Gallardo*, 977 F.3d 1126, 1142 (11th Cir. 2020). Here, in addition to violating its Rule 16 obligations, the prosecution permitted the trial to proceed despite being unsure whether undisclosed discovery — which it had never reviewed — contained *Brady* material that could have assisted Mr. Carson's defense or exculpated him at trial. Shockingly, the prosecutor admitted at trial with respect to the late-disclosed documents:

> We recognize that there may be documents in that set of emails that defendants want to use for some purpose. They may identify something that they claim is Brady. Because we have not reviewed it, I can't stand here today and say what is in or what is not in those documents.

(Doc. 323-103). As for the prosecutors' failure to review the discovery to determine if it contained *Brady* material, this, too, was a breach of their prosecutorial obligations. As one Middle District of Georgia judge has observed:

> *Brady* and *Giglio* impose ***active duties*** on prosecutors prior to trial. A prosecutor is ***duty-bound to ascertain*** whether government agents and the police have evidence favorable to the defendant. *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). A prosecutor must also decide whether such evidence should be disclosed to the defendant. *Id*. at 439, 115 S.Ct. 1555. This decision turns on the materiality or force of the undisclosed

36

> evidence, which is to be viewed in the aggregate. *Id*. at 436, 115
> S.Ct. 1555. Accordingly, there should be no doubt that, consistent
> with a general duty to secure justice, a prosecutor bears ***an initial
> duty timely to uncover*** all evidence in the Government's possession
> that may favor the defendant. *See id*. at 436–37, 115 S.Ct. 1555.

*United States v. Lyons*, 352 F. Supp. 2d 1231, 1243–44 (M.D. Fla. 2004) (Presnell, J.)

(emphasis added).  Here, Mr. Carson was deprived of even a "sporting chance" to a fair

trial.  *See Brady*, 373 U.S. at 90.

As it turns out, the undisclosed emails did, indeed, contain impeachment

materials.  Although the defense has yet to finish its review of the 100,000+ emails[10], an

inspection undertaken post-trial has so far uncovered six emails which reveal that key

Government witness Kathryn Gannon (the Envistacom employee who helped Ed Dove

create IGCEs for the IntelliPeak contracts) was providing Army employees (including

Lt. Col. Koch) with various services such as creating several "spend plans" including

one for allocating funds related to a Government contract for a biometric hand-held

device (Attachments A, B & C); providing a cost estimate for a military conference in

Stuttgart, Germany (Attachments D & E); and acting as a point of contact on a contract

extension, (Attachment F).  Over a dozen Government and civilian recipients were

copied on these emails, and Ms. Gannon was clearly identified as a non-government

---

[10] As of August 21, 2024, Mr. Carson has reviewed approximately 20,000 emails, and estimates the total disclosure to be approximately 124,398 emails not including attachments.

civilian. (*Id.*). These undisclosed emails could have been used directly to impeach Ms. Gannon's trial testimony that she and co-defendant Hayes used their private email accounts to discuss "contracts and stuff that we, as government contractors, should not be doing. . ..  That we were doing things that weren't necessarily under -- that weren't under a government contractor's or business's purview to do." (Doc. 327-93-94).  These six undisclosed emails established that Ms. Gannon was doing *plenty* of things that were not under a private business's purview to do.  The six undisclosed emails also could have been used to impeach Ms. Gannon's explanation that she used her personal email when discussing work she did on the contracts charged in the indictment "[b]ecause this business that I was participating in was not legal."  *Id*. at 132.  Certainly, doing the Government's work in creating spend plans for the Army, providing a cost estimate for a military conference, and acting as a point of contact on a Government contract extension also would not be considered to be "legal" under her definition, yet she used her business email nonetheless.

Mr. Carson has established that (1) the prosecution withheld until mid-trial evidence "favorable" to him; (2) the defense didn't possess the evidence and couldn't have obtained it with due diligence because it consisted of Government emails stored on Government servers; (3) the prosecution withheld the evidence until trial[11]; and (4) if

---

[11] In *Brady v. Maryland,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process

the evidence had been disclosed to Mr. Carson, he could have used it to impeach a key

Government witness.   The court should have dismissed the indictment with prejudice.

At a minimum, given the struggle the jury endured in reaching a verdict in this extremely

close case (*see infra* Section II), Mr. Carson is entitled to a new trial.  *See United States*

*v. Laines,* 69 F.4th 1221, 1230–31 (11th Cir. 2023) ("Under *Brady v. Maryland*, a court

should grant a new trial if the prosecution suppresses favorable evidence that is material

to the defendant's guilt or punishment and that creates a 'reasonable probability' of a

different trial outcome.").

II. **GIVING AN *ALLEN* CHARGE WAS UNDULY COERCIVE IN THIS CASE; THE TRIAL COURT SHOULD HAVE GRANTED A MISTRIAL AFTER THE <u>FOURTH</u> TIME THE JURY DECLARED IT WAS HUNG AND INFORMED THE COURT OF ITS SPLIT.**

The Supreme Court in *Allen v. United States*, 164 U.S. 492 (1896), held that a

trial court may instruct a deadlocked jury to keep deliberating.   This instruction,

commonly referred to as a "dynamite" or "*Allen* charge," has been modified over the

years in an attempt to reduce its coercive impact.  Although a district court has broad

discretion to decide whether to give a modified *Allen* charge to a jury, the discretion is

not unlimited; it must not be given under circumstances that "coerce any juror to give

up an honest belief."  *United States v. Hill*, 99 F.4th 1289, 1310 (11th Cir. 2024) (quoting

---

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

*United States v. Davis*, 779 F.3d 1305, 1312 (11th Cir. 2015)).  Under the law of this circuit, a trial court abuses its discretion in giving a modified *Allen* charge if, considering the totality of the circumstances under which it is delivered, the charge is "inherently coercive."  *Woodard*, *supra*, 531 F.3d at 1364.  What counts, when determining whether a deadlocked jury has been coerced by being instructed to keep deliberating, is "the overall circumstances and risk of coercion."  *Davis*, 779 F.3d at 1313.

Under the circumstances of this case — where the jury informed the judge no less than **<u>four times</u>** during its deliberations that it was deadlocked and unable to reach a verdict, and where the foreperson advised the judge in front of the jury that some jurors (including the foreperson) were unable to "change the votes" of other jurors who "were on the other side of the government" — giving a modified *Allen* charge was inherently coercive to jurors voting to acquit.  Instead of giving a modified *Allen* charge, the judge should have granted Mr. Carson's motion for a mistrial.  Mr. Carson's conviction should be reversed.

As this Court explained in *Brewster v. Hetzel*, 913 F.3d 1042 (11th Cir. 2019):

> A defendant "being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241, 108 S.Ct. 546, 552, 98 L.Ed.2d 568 (1988). Coercion does not mean "simple pressure to agree." *Smith v. United States*, 542 A.2d 823, 824 (D.C. 1988). As one court explained, "such pressure is a natural function of sending twelve persons into a jury room to deliberate." *Id*. Pressure becomes coercive when the actions of the court result in "a minority of the jurors ... sacrific[ing] their conscientious scruples for the sake of reaching agreement." *Green v. United*

> *States*, 309 F.2d 852, 854 (5th Cir. 1962). While a trial court may instruct a deadlocked jury to continue deliberating, it "must not coerce any juror to give up an honest belief." *United States v. Davis,* 779 F.3d 1305, 1312 (11th Cir. 2015); *see Showers v. State*, 407 So.2d 169, 171 (Ala. 1981) ("It is quite clear that ... a trial judge may urge a jury to resume deliberations and cultivate a spirit of harmony so as to reach a verdict, as long as the court does not suggest which way the verdict should be returned and no duress or coercion is used.").

913 F.3d at 1053. To determine whether a modified *Allen* charge has unduly coerced a jury, this Court must "examine the totality of the circumstances to see if the [trial] court's actions created a substantial risk that one or more jurors would be coerced into abandoning their honest convictions." *Id*. (citing *Woodard*, 531 F.3d at 1364). The relevant circumstances to consider include: (1) the length of the deliberations; (2) the number of times the jury reported being deadlocked; (3) whether the court was aware of the numerical split when it instructed the jury to continue deliberating; and (4) the time between the court's final instruction and the jury's verdict. *See Hill*, 99 F.4th at 1310 (citing *Brewster*, 913 F.3d at 1053). Here, all four factors counseled the trial court to declare a mistrial and suggest that the *Allen* charge (also referred to as a "dynamite" charge) the trial court ultimately gave was, under the circumstances, overly coercive.

As to the first factor, length of deliberations, the jurors had deliberated a little over 12 hours, and already had been given four charges to continue deliberating after declaring they were hung, (Doc. 201-6-7, 17, 24, 30; Doc. 202-25), before they were given the modified *Allen* charge. (Doc. 202-33-34). They then deliberated another 6

41

hours, 15 minutes, for a total of approximately 18½ hours, before reaching a verdict.  As this Court has recognized: "The risk of coercion increases as deliberations run longer." *Davis, supra*, 779 F.3d at 1314.  Here, the length of deliberations, coupled with multiple indications of having reached a stalemate, suggests that the *Allen* charge was unduly coercive in this case.

As to the second factor, the number of times the jury reported being deadlocked, the jurors reported to the judge on <u>four separate occasions</u> that it was at an impasse during its roughly 18½ hours of deliberations.  (Doc. 201-6-9, 18-19, 25; Doc. 202-26).  <u>The first indication</u> of a hung jury came when the court security officer reported that four or five jurors were refusing to talk, and that the jurors "seem to have reached an impasse."  (*Id*. at 7).  When the foreperson advised that "multiple jurors" were "not willing to participate," the judge called all the jurors into the courtroom and asked whether they were deliberating.  (*Id*. at 7-16).  Two jurors responded that they were "all deliberating," but a third juror responded that they "all *deliberated*," (*id*.) (emphasis added), suggesting that deliberations had ended.  When the judge asked a third juror whether the jury was still deliberating, he responded, "I believe we feel like we're done, your Honor."  (*Id*.).  Other jurors "nodded along in agreement with that."  (*Id*. at 21; *see also id*. at 22) ("Everybody said, no, we are deliberating, but we are done.").  The judge then gave an abbreviated modified *Allen* charge, imploring them to "discuss the case with one another and try to reach an agreement" and not to "hesitate to re-examine your

own opinion and change your mind if you become convinced that you were wrong," while at the same time suggesting they not "give up your honest beliefs just because other things -- others think differently or because you simply want to get the case over with." (*Id*. at 17). The second indication it was gridlocked came when the jury sent a note announcing, "We did deliberate" but "[w]e could not agree." (Doc. 201-18). The judge again instructed them to keep deliberating. (*Id*. at 24). The third time, the foreperson advised that the jurors were "not making anymore progress" and "they feel like they're done," (*id*. at 24-25), but the judge again instructed them to continue deliberating, (*id*. at 24-2, 315). The fourth time the jury advised that it had "not reached a decision" and that "nothing is going to change, (Doc. 202-26), the judge gave a full modified *Allen* charge, (*id*. at 33-34).

As this Court has observed: "One or two, or even three, instructions requiring a deadlocked jury to keep on deliberating might not be a problem, depending on the surrounding circumstances. But five instructions aimed at breaking a deadlock is a lot (especially, as we will discuss, when the judge knew exactly how the jury was divided)." *Brewster,* 913 F.3d at 1054. The same holds true here. Admonishing the jurors on four separate occasions to continue deliberating was coercive under the circumstances of this case, especially when considering the third factor, i.e., whether the judge knew of the jury's numerical split when he instructed the jury to continue to deliberate.

As to this third factor, the first time the jury indicated it was at an impasse the court security officer informed the judge that "four or five of the jurors are refusing to even talk," and that "[m]aybe their minds are made up or something, but they seem to have reached an impasse." (*Id*. at 7). After being summoned into the courtroom, one of the jurors told the judge that they had "deliberated" and "I believe we feel like we're done," to which other jurors nodded in agreement." (*Id*. at 16, 21). Later, after the third time the judge was informed that the jury was at a stalemate, the jurors were summoned for a second time into the courtroom. (*Id*. at 24). At this point, the foreperson disclosed to the judge that it was his and apparently most of the other jurors' desire to convict the defendants, but they were unable to persuade jurors who were "on the other side of the government," i.e., favored a defense verdict, to convict:

> So after we left, we went over some of the same exhibits and facts that we talked about and even found new items that we discussed, but it appears at the end of it all, ***it was not enough to sway and change the votes of prospective jurors that already had a vote that was on the other side of the government***.

(*Id*. at 25) (emphasis added). In other words, the foreperson let the judge know, in front of the entire jury, that jurors who wished to vote for acquittal could not be dissuaded. Because the judge already knew there were four or five holdouts, this disclosure not only informed the judge that the foreperson (and apparently 6-7 other jurors) favored conviction, but that the holdouts who favored acquittal were unwilling to be "swayed."

44

Once the judge knew this split, and the jury knew that she knew it, any *Allen* charge the judge would later give would, by definition, be inherently coercive.

> Pressure on jurors, especially on holdout jurors, is increased when the instructions to keep trying to reach unanimity come from a judge who knows how split the jury is and in which direction. That is why the Supreme Court has exercised its supervisory authority to prohibit federal judges from inquiring how deadlocked juries are split. The Court has explained that inquiring about the specifics of the split "serves no useful purpose," tends to be coercive, and "can rarely be resorted to without bringing to bear ... an improper influence upon the jury." *Brasfield v. United States*, 272 U.S. 448, 450, 47 S.Ct. 135, 135–36, 71 L.Ed. 345 (1926).

> \*   \*.   \*

> [T]he Supreme Court's prohibiting federal judges from inquiring into the specifics of a jury split underscores the problem with the judge having that knowledge. *Lowenfield*, 484 U.S. at 240, 108 S.Ct. at 552. The problem exists whether the judge asked for the information or the jury disclosed it without any prompting. ***If the jury is aware that the court knows it is divided in favor of convicting the defendant, and the court repeatedly instructs the jury to continue deliberating, the jurors in the minority may feel pressured to join the majority in order to placate the judge.*** See *Brasfield*, 272 U.S. at 450, 47 S.Ct. at 135–36. That pressure only increases when, as here, the judge is told that the jury is divided 9 to 3 for conviction, and then 11 to 1 for conviction, and later that it is still hung at 11 to 1 for conviction.

> The judge knew—and the jurors knew that the judge knew—there was but a single holdout standing between a mistrial and a guilty verdict. Everything that happened after the jury sent the second of five deadlock notes with the 11 to 1 breakdown has to be understood in that context. It was as if the judge were saying: "I know [there is one] of you [who is] holding up a verdict; you should stop being so stubborn and fall in line." *Smith*, 542 A.2d at 825. And that is what the holdout juror finally did. After three more

> deadlock notes and several additional instructions to keep deliberating, she finally fell in line and voted to convict.

*Brewster*, 913 F.3d at 1054-55 (emphasis added). While the trial court cannot ask for the breakdown, here it was effectively disclosed. The judge knew that the foreperson and at least some (and it appears 6 or 7) of his fellow jurors were voting to convict and were trying to convince the jurors who were voting to acquit to change their position. The judge also knew that the foreperson, who favored conviction, was the only juror who wished to continue deliberating; the judge asked the assembled jury, "Is there anyone who wants to continue deliberating?" and the foreperson responded, "I'm the only one I would say." (Doc. 201-25-26). Despite knowing all this, the judge nevertheless gave an *Allen* charge. As in *Brewster*, it was as if the judge were saying to the holdouts who were voting to acquit: "*I know there are some of you who are holding up a verdict; you should stop being so stubborn and fall in line*."

By instructing the jurors to continue to deliberate as only the conviction-favoring foreperson favored, the judge appeared to be endorsing the foreperson's position. In other words, the instruction to continue to deliberate had the effect of telling jurors who were "on the other side of the government" that they should disregard their firmly-held beliefs in favor of those held by the foreperson. Moreover, the dynamite charge had the effect of suggesting to the holdout jurors who had told the judge they were "done" that they were violating their oaths or acting improperly by failing to reach a verdict.

46

Pressure on jurors, especially on holdout jurors, is increased when the instructions to keep trying to reach unanimity come from a judge who knows how split the jury is and in which direction. *See Lowenfield,* 484 U.S. at 240; *Brasfield*, 272 U.S. at 450. This is exactly the situation in which this Court has cautioned that giving an *Allen* charge would be unduly coercive.

As to the fourth and final factor, the time between the court's final instruction and the jury's verdict — six hours, 15 minutes after receiving the modified *Allen* charge — the jury had reached a verdict. (Doc. 203-5). Having gone from a 4/8 or 5/7 split — and persistent refusal to deliberate — to a unanimous verdict on all counts, it appears obvious that the *Allen* charge impacted the jury's verdict.

Significantly, although the modified *Allen* charge given in this case has been approved in this circuit, at least one panel of the Eleventh Circuit has viewed some of the language — such as "the trial has been expensive in time, effort, money, and emotional strain to both the defense and the prosecution" and "if a substantial majority of your number are in favor of a conviction, those of you who disagree should reconsider whether your doubt is a reasonable one, since it appears to make no effective impression upon the minds of the others" — as overly coercive. *See United States v. Rey*, 811 F.2d 1453, 1460 (11th Cir. 1987) ("As we see it, the Allen charge interferes with the jurors when they are performing their most important role: determining guilt or innocence in a close case. It unjustifiably increases the risk that an *innocent* person will be convicted

47

as a result of the juror abandoning his honestly-held beliefs. . . . If this were a question of first impression, we would find the Allen charge in this case impermissible.") (emphasis in original). As the Court in *Rey* explained:

> One of the safeguards against the conviction of innocent persons built into our criminal justice system is that a jury may not be able to reach a unanimous verdict. Furthermore, a hung jury does not necessarily result in a retrial: one or both parties frequently change their view of the case so that a plea arrangement is reached or charges are dropped. Consequently, there is no necessity for judges to force a verdict.

811 F.2d at 1460.

Here, there was no need for the trial judge to wring a unanimous verdict out of this conflicted jury — or, more accurately, a guilty verdict out of jurors who wished to acquit. The dynamite charge given by the trial court under the unique circumstances of this case was unduly coercive and resulted in unfairly-obtained conviction.

III. **EVIDENCE OF MAJOR FRAUD AND CONSPIRACY TO DEFRAUD WAS INSUFFICIENT TO CONVICT.**

Mr. Carson was charged with defrauding the Government, and conspiring to do so, by providing independent government cost estimates (IGCEs) to Ed Dove, a contracting officer's representative (COR) employed by the Navy for a contract on which Mr. Carson's company, Envistacom, was to serve as the subcontractor. The flaw in the Government's case, however, is that Ed Dove was responsible for creating these IGCEs and chose to delegate the responsibility to Envistacom employees. Instead of

defrauding the Government, Mr. Carson and Envistacom were doing no more than assisting a Government employee in carrying out his responsibilities. Moreover, even the Government has acknowledged that the IGCE's reflected fair and reasonable pricing; hence, there was no loss to the Government and thus no scheme to defraud the Government of money. The judge should have granted his Rule 29 motions. (Doc. 330-132).

Indeed, this must have been how the prosecutors viewed this case: while Mr. Carson and Envistacom were indicted for major fraud and conspiracy under 18 U.S.C. §§ 1031 and 371, Ed Dove was never prosecuted nor held to account in any way. Despite being the alleged mastermind without whom there would have been no crime, Dove wasn't even required to testify in exchange for immunity. Instead, he was given a free pass, permitted to remain in his job, and retired with full benefits. The jury must have seen this, too, when it struggled to reach a verdict. Call it lack of materiality, call it entrapment by estoppel — whatever the name, it amounts to insufficient evidence to convict Mr. Carson of defrauding the Government, or conspiring to do so.

Title 18, U.S.C. § 1031 makes it a crime to

> knowingly execute[] . . . any scheme or artifice with the intent-- **(1)** to defraud the United States; or **(2)** to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in [the] procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of such . . . is $1,000,000

Title 18, U.S.C. § 371 makes it a crime for

> two or more persons [to] conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose, [if] one or more of such persons do[es] any act to effect the object of the conspiracy . . .

In order to defraud, the scheme or false pretenses must be "material." *See United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) ("A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property."). "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *See Neder v. United States*, 527 U.S. 1, 16 (1999) (using this definition to interpret the mail, bank, and wire fraud statutes). Materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)).

Here, Mr. Carson's involvement in the submissions of IGCEs to the Government was not part of a scheme to defraud the Government because they were solicited from him *by the Government*. A Government agent employed by the Navy, COR Ed Dove, asked Mr. Carson to provide the IGCEs for contracts on which Envistacom was the subcontractor. It was one of Ed Dove's duties as a COR to create IGCEs for Government contracts, and he delegated that duty to the subcontractor on the contracts. Factually,

there was no "scheme or artifice" or "false or fraudulent pretenses, representations, or promises" aimed at defrauding the Government, because the Government, through its agent Ed Dove, knew that Mr. Carson was providing the IGCEs. Legally, Mr. Carson's conduct is insulated from criminal liability by the affirmative defense of "entrapment by estoppel" because he "relied on official government communications before acting in a manner proscribed by law." *United States v. Johnson*, 139 F.3d 1359, 1365 (11th Cir. 1998). Indeed, this wasn't just a case where a Government official told Mr. Carson that producing IGCEs was legal; a Government official actually *told him to do it*. In sum, it was both factually and legally impossible for Mr. Carson to have defrauded the Government; he could not scheme to defraud the Government by doing exactly what the Government requested he do.

Apparently, this was "business as usual" with the awarding of Government contracts. Kathryn Gannon, the Program Manager for Envistacom who worked under co-defendant Valerie Hayes, was involved in the pre-award process for all three contracts and testified for the Government[12], admitted that she was not surprised that

---

[12] Curiously, Ms. Gannon was neither indicted for her conduct nor immunized for her testimony. (Doc. 328-43; Doc. 329-161). Nor was she required to disgorge her 1% commission from the contracts. (Doc. 328-47-48).

Envistacom was creating the ICGEs for these contracts, "[b]ecause this is something that was just done." (Doc. 327-89). According to Ms. Gannon, "[t]his is kind of business as usual when it came to certain government contracts," including those for Valerie Hayes. (*Id.*). Ed Dove wasn't the only Government employee for whom Ms. Gannon provided cost estimates; she also provided them to Dr. Evan Huelfer, employed by the Army as a manager for the Defense Forensic Science Center/Forensics Exploitation Department (DFSC/FXD) who was working on the 338A contract, along with talking points and draft language for him to send to Army Major Jeanette Bernaola who also was assigned to 338A. (Doc. 328-30, 50-56; Ex. D2-38 at 1-2). Ms. Gannon also provided Dr. Huelfer with a performance work statement (PWS) and a cost estimate, as well as talking points, for presentation to the General Services Administration (GSA). (Doc. 328-56-58; Ex. D2-31). Ms. Gannon also provided talking points to Lt. Col. Koch for him to use in connection with an unrelated contract for a communications network. (Doc. 328-21-24; Ex. D2-218.). She also assisted Major Bernatola, who sent Ms. Gannon an email asking for Ms. Gannon's help with:

> Kathryn, I think we're going to need your help on this. Before I make s**t up and put in Blocks 7, 12 and 13, is this stuff in their new PSW or other documents.

(Doc. 328-98-99; Ex. D3-185). Later, Dr. Huelfer asked for an update on the information Ms. Gannon was providing to Major Bernaola. (*Id.* at 98-99; Ex. D3-185).

And Valerie Hayes provided Major Bernaola with PWSs for contracts 313A and 338A. (Doc. 328-59-61; Ex. D2-40). All of these examples are of Government employees delegating their job duties to Envistacom employees. Business as usual.[13]

There was significant testimony from Government witnesses that it was typical for private contractors to participate in the award process, and it was permissible for the Government to make a price-reasonableness determination with a quote from the known subcontractor. (Doc. 328-202). For example, Micah Kauzlarich testified that he was "fine" relying on a quote from Envistacom when making his price-reasonableness determination on the IntelliPeak contract, despite knowing that Envistacom was the intended subcontractor on the contract. (Doc. 328-197-99, 202-03; Exs. D2-122, D1-45). And Don Hadrick testified that an exchange of information between the contractor, the HHS contracting officer and the client agency (Army or Navy) can take place right up until the time the COR issues his cost estimate; these communications can include cost estimates provided by the contractor. (Doc. 329-56). There even is a term for a contractor-provided cost estimate: "rough order magnitude" or "ROM." (*Id.*).

According to Government witnesses, the Federal Acquisition Regulations (FAR) actually encourage the Government to work with private contractors and communicate

---

[13] None of the military personnel who were involved in this alleged "scheme to defraud" was indicted.

53

with them as early as possible in the pre-solicitation phase of a Government contract to formulate solutions that will be best for the Government. (Doc. 328-190-91; Doc. 329-166-68). For example, FAR Part 15, 15.201(C) — the Simplified Acquisitions procedures that were used in awarding the IntelliPeak contract extension in order to move the contract along more quickly — permits contractors to be involved in discussions with the Government regarding the proposed contract type, the terms and conditions of the contract, any acquisition planning schedules and strategy, suitability of the proposal instructions, and even the contract's feasibility. (Doc. 328-191, 193, Doc. 329-166-70; Ex. D2-11). Subsection C also allows the Government to discuss with the contractor performance requirements, the statement of work, evaluation criteria and how to assess past performance. (*Id*. at 194; Ex. D2-11). Applying these relaxed procedures, permitting the Government and the private contractor to work together and pass information back and forth, "helps the government to talk with the contractor so that the government is getting exactly what it wants." (Doc. 328-194, Doc. 329-170). Communications between the Government project manager — who in this case was Ed Dove — and a private contractor such as IntelliPeak is not only allowed, it's the norm. (*Id.* at 194-95).

The defense of entrapment by estoppel "rests upon principles of fairness." *United States v. Thompson*, 25 F.3d 1558, 1564 (11th Cir. 1994). Here, it was totally unfair to prosecute Mr. Carson for creating IGCEs yet hand a get-out-of-jail-free card to the

Government employee who directed his company to do it. Although Ed Dove was the lynchpin of this alleged crime — a Government employee who from the inside of a federal agency orchestrated a supposed multi-million dollar criminal conspiracy to defraud the United States — Dove was neither prosecuted nor required to render cooperation to the Government in terms of testifying for the prosecution at trial. Amazingly, Dove was described at trial by his supervisor as a "good" employee who had "no performance issues" and had "no complaints" in his file – even though the conduct alleged in the indictment took place in 2015, two years before he was allowed to retire from the Navy. (Doc. 326-155-57). The fact that Ed Dove was a Government official should have made his participation in any alleged crime even more aggravated than that of any non-Government participants. *Cf. United States v. Hernandez*, 554 F. App'x 804, 806 (11th Cir. 2014) (". . . Hernandez qualified for an abuse-of-trust enhancement under § 3B1.3. As a corrections officer with extraordinary discretion in the performance of his duties, he held a position of public trust, and he abused that trust, both when he approached an inmate under his care and control about trafficking narcotics and when he used his uniform and law enforcement credentials to avoid detection while committing the offense."). Even the judge was perplexed as to why Ed Dove wasn't charged. (Doc. 256-41).

Additional evidence that there was no fraudulent scheme to obtain money or property from the Government was that there was no loss to the Government. (Doc.

55

284-9).  It was clear from the trial testimony that all of the requirement of the contracts were met.  (Doc. 329-67-68).  Moreover, the Government cannot argue that Mr. Carson is guilty of fraud because it wouldn't have paid Envistacom on the contracts if it knew its employees had participated in providing the IGCEs.  As the Supreme Court has observed,

> [a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.

*Universal Health Services*, *supra*, 579 U.S. at 194.  And, again, the Government was aware of it.  Nor can the Government argue that the Government relied on IGCEs prepared by Envistacom employees when the contracts were paid.  For example, Bryan Daines, the contracting specialist[14] on 313A who worked for Don Hadrick, did not rely on Ed Dove's IGCE when he decided whether the contract should be awarded; instead he did his own market research.  (Doc. 329-24, 80).  Finally, there was conflicting testimony as to whether IGCEs were even required for these were sole-source, non-

---

[14] The job of a "contracting specialist" is "to award the contract, oversee the administration of the contract and close out the contract and, during the administration, deal with any contractual issues that arise."  (Doc. 328-118).

56

competitive bid contracts. (*Compare* Doc. 327-182-83; Doc. 328-128 *with* Doc. 328-134).

For all of these reasons, the evidence does not support Mr. Carson's convictions.

IV. **THE GOVERNMENT'S REFUSAL TO DISCLOSE *GIGLIO* MATERIAL THAT COULD HAVE BEEN USED TO IMPEACH A KEY GOVERNMENT WITNESS PREJUDICED MR. CARSON'S ABILITY TO DEFEND HIMSELF AT TRIAL.**

Under *Giglio v. United States*, 405 U.S. 150 (1972), "the prosecutor must turn over . . . any impeachment evidence that is likely to cast doubt on the reliability of a witness whose testimony 'may well be determinative of guilt or innocence.'" *United States v. Jordan*, 316 F.3d 1215, 1253 (11th Cir. 2003) (quoting *Giglio*, 405 U.S. at 154). "Impeachment evidence should be disclosed in time to permit defense counsel to use it effectively in cross-examining the witness." *Jordan*, 316 F.3d at 1253. Here, the trial court should have granted Mr. Carson's motion to exclude the testimony of Donald Hadrick, a key Government witness who testified at trial, based on the Government's refusal to disclose *Giglio* material that the defense could have used to impeach Hadrick's testimony. (Doc. 175; Doc. 323-118-19).

Don Hadrick was an employee of the U.S. Department of Health and Human Services (HHS) in its Program Support Center ("PSC"), the special division of HHS that awards Department of Defense ("DoD") Section 8(a) contracts on a fee-for-service basis. (Doc. 328-220-25, 227-30; Doc. 175-1-3). Hadrick served as the supervisory

contracting officer for contracts 313A and 338A and had ultimate responsibility for either awarding or not awarding these contracts. (Doc. 328-227-29). At trial, Hadrick provided damning testimony that had he known a subcontractor had written the IGCEs submitted to him by Ed Dove, he never would have awarded the contracts. (Doc. 329-34). But on cross-examination, Hadrick was forced to admit that disallowing the contracts wasn't his only option; a less-onerous option would have been to obtain market research from people on his staff – or even from Ed Dove – to verify that the IGCEs were fair and reasonable. (*Id.* at 44-46, 49-50). Then, he could have awarded the contracts. Nevertheless, even though the contracts were merely continuations of previously-awarded contracts; were for supplies and services supporting active U.S. troops in the field; and which if not awarded would have left the troops high and dry because the fiscal year would have lapsed the following day, (*id*. at 38-40, 43), Hadrick steadfastly maintained that he would have cancelled the contracts had he known Ed Dove's IGCEs were drafted by a subcontractor, (*id*. at 84-85).

Prior to trial, the defense learned from media news stories that Hadrick had been suspended from his position as part of a larger investigation into HHS's PSC division. (Doc. 175-1-3). From what was known publicly, the investigation, which ultimately shut down the PSC, uncovered that about 75 percent of contracts the PSC awarded were for DoD/SBA Section 8(a) sole-source contracts in which the PSC was not enforcing limitations on subcontracting. (Doc. 323-112). The defense sought disclosure of the

PSC investigation to use in cross-examining Hadrick on his claim that he was duped by Ed Dove, and that he never would have awarded contracts 313A and 338A had he known who authored the IGCEs. Although the Government told the defense it had requested the investigative file from HHS, the files were never disclosed to Mr. Carson. (Doc. 175-1; Doc. 323-112-13).

Given the dubious nature of Don Hadrick's testimony, which likely was the nail in Mr. Carson's coffin, the prosecution should have disclosed the details of the PSC investigation of Hadrick that led to his suspension from HHS.[15] *See Giglio*, 405 U.S. at 154 (requiring disclosure of evidence "likely to cast doubt on the reliability of a witness whose testimony 'may well be determinative of guilt or innocence'"). Because the PSC investigation and its outcome were potential impeachment information that bore directly on Don Hadrick's credibility, the Government was required to disclose it. *See, e.g., United States v. Espinosa-Hernandez*, 918 F.2d 911, 913-14 (11th Cir. 1990) (Government's failure to disclose misconduct of federal agent who was key prosecution witness at trial entitled defendant to remand for evidentiary hearing on motion for new

---

[15] At trial, Hadrick acknowledged that despite having been placed on administrative leave, the Government "never charged me with anything" and he was later offered (and accepted) a job by another federal agency, the Department of Housing and Urban Development (HUD). (Doc. 328-225-26).

trial).  The trial court should have granted the motion to exclude Hadrick's testimony or, at a minimum, ordered the Government to produce the PSC investigative file.

For this additional reason, Mr. Carson's convictions should be reversed.

## <u>CONCLUSION</u>

For the above and foregoing reasons, Mr. Carson respectfully requests that his convictions be reversed or, at a minimum, that he be granted a new trial.

Respectfully submitted,

*/s/ Amy Levin Weil*
Amy Levin Weil
THE WEIL FIRM, LLC
511 East Paces Ferry Road, N.E.
Atlanta, GA  30305
404/581-0000

Counsel for Appellant Alan Carson

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using WordPerfect word processing software in 14-point Times New Roman.

This brief is in excess of the 13,000 word type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, according to the word processing software, it contains 15, 411 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). A motion for permission to file excess words is pending before the Court.

*/s/ Amy Levin Weil*
Amy Levin Weil

**CERTIFICATE OF SERVICE**

I hereby certify that today a true and correct copy of the foregoing Brief for Appellant Carson was electronically filed via the Court's CM/ECF system and served upon all counsel of record in this case.

This 23rd day of August, 2024.

/s/ *Amy Levin Weil*
Amy Levin Weil